UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

CARMEN IRIS GONZALEZ GONZALEZ,

               Plaintiff,

       -against-

COMMISSIONER OF SOCIAL SECURITY,

               Defendant.

------------------------------------------------------------X

**OPINION AND ORDER**

17 Civ. 1976 (JCM)

       Plaintiff Carmen Iris Gonzalez Gonzalez ("Plaintiff") commenced this action pursuant to

42 U.S.C. § 405(g), challenging the decision of the Commissioner of Social Security ("the

Commissioner"), which denied Plaintiff's application for Supplemental Security Income ("SSI")

benefits, finding her not disabled within the meaning of the Social Security Act. (Docket No. 2).

Presently before this Court are (1) Plaintiff's motion, pursuant to Rule 12(c) of the Federal Rules

of Civil Procedure, for judgment on the pleadings, (Docket No. 22), and (2) the Commissioner's

cross-motion for judgment on the pleadings, (Docket No. 24).[1]  For the reasons below, Plaintiff's

motion is denied and the Commissioner's cross-motion is granted.

## I.  BACKGROUND

       Plaintiff was born in June 1968. (R.[2] 101).  She applied for SSI benefits on August 5,

2013. (R. 198).  The Social Security Administration ("SSA") denied her application, (R. 133),

and she requested a hearing before an Administrative Law Judge ("ALJ"), (R. 137).  ALJ Miriam

Shire conducted a hearing on April 21, 2015. (R. 63–100).  In a decision dated July 30, 2015,

ALJ Shire found Plaintiff not disabled. (R. 30–43).  Plaintiff requested that the Appeals Council

---

[1] This action is before me for all purposes on consent of the parties, pursuant to 28 U.S.C. § 636(c). (Docket No. 14).

[2] Refers to the certified administrative record of proceedings related to Plaintiff's application for social security benefits, filed in this action on June 22, 2017. (Docket No. 15).

review the ALJ's decision. (R. 18). On January 12, 2017, the Appeals Council denied review,

rendering the ALJ's decision the final decision of the Commissioner. (R. 1–9). Plaintiff

appealed the Commissioner's decision by filing the present action on March 17, 2017,

contending that ALJ Shire's decision was contrary to law and not supported by substantial

evidence. (Docket No. 2). The relevant period at issue is from the August 5, 2013 application

date through the Commissioner's July 30, 2015 final decision.

## A. Plaintiff's Medical Treatment History

As summarized below, the administrative record reflects medical treatment Plaintiff

received for various mental and physical conditions before and during the relevant period.[3]

## 1. Medical Evidence Generated Before the Relevant Period

Plaintiff received treatment at the Riverdale Mental Health Center ("Riverdale") from

March 2009 through July 2013 for depression and anxiety. (R. 281–359, 363–72, 458–88,

*repeated* 410–31, 442–44, 528–32, 534–35, 545–46).

Plaintiff was interviewed by social worker Jennie Ingram at Riverdale on March 27,

2009. (R. 281, *repeated* 629). Plaintiff reported feeling depressed, hearing auditory

hallucinations and not sleeping or eating. (R. 281). Plaintiff's medications were Depakore,

Clonazepam and Fluoxetine. (R. 281).

Thereafter, on April 3, 2009, Plaintiff saw a Riverdale psychiatrist, Jimmy Chen, who

took Plaintiff's history through a relative because Plaintiff only spoke Spanish. (R. 283–87,

*repeated* 470–74). Dr. Chen noted that, even in Spanish, Plaintiff was a poor historian. (R. 283).

Plaintiff reportedly experienced dysphoria, crying spells, loss of appetite, sleeplessness, anxiety,

poor concentration and low energy. (R. 283). Dr. Chen diagnosed major depression and

---

[3] Plaintiff's memorandum of law asserts that Plaintiff's "mental disorder grounds her disability claim." (Docket No. 23 at 17). Accordingly, the following summary focuses primarily on Plaintiff's mental condition.

seizures. (R. 287). The treatment plan called for Plaintiff to restart Prozac, "which was helpful to her before," and to start Klonopin for her anxiety. (R. 287). After seeing Plaintiff again on April 19, 2010, Dr. Chen noted that Plaintiff was stabilized on her current medication regimen, with no side effects and a steady mood. (R. 476).

Progress notes reflect Plaintiff's treatment at Riverdale by psychiatrist Alexa Whoriskey, M.D., from November 16, 2010 through October 27, 2011. (R. 458–69, 481–82). Dr. Whoriskey noted that Plaintiff walked in on November 16, 2010, because she had run out of medication for five days and was very anxious. (R. 481). Plaintiff stated that her anxiety was under reasonable control before she ran out of medication. (R. 481). Plaintiff reported that she only took her Prozac when she felt "really bad," and she was not sure the last time she had taken it. (R. 481). Dr. Whoriskey discussed the importance of taking the medication daily. (R. 481). Dr. Whoriskey also recommended that Plaintiff restart therapy. (R. 481–82).

On March 18, 2011, Plaintiff told Dr. Whoriskey that she had run out of her medications about six weeks before the appointment. (R. 458). She reported feeling better when taking her medications daily, but was still anxious when traveling by herself. (R. 458). Dr. Whoriskey stressed the importance of coming to appointments before running out of medications. (R. 458). Dr. Whoriskey observed that Plaintiff's mood was very depressed and her insight and judgment were both poor to fair. (R. 458). His impression was that Plaintiff had major depressive disorder and anxiety problems and was having increased symptoms "due to nonadherence with meds." (R. 459). On June 14, 2011, Plaintiff saw Dr. Whoriskey again after missing a prior appointment and running out of her medications for two weeks. (R. 462).

Dr. Whoriskey had similar observations after seeing Plaintiff again on July 27, 2011. (R. 460–61). Plaintiff reported continued symptoms despite medication adherence. (R. 460). Dr.

Whoriskey's impression remained that Plaintiff had major depressive disorder and anxiety problems with continued symptoms "due likely [to] underdosing of medication and intermittent adherence." (R. 461). Dr. Whoriskey noted that Plaintiff reported taking Depakote for seizures, but Plaintiff was "unable to provide more info." (R. 461).

On September 2, 2011, Plaintiff saw Dr. Whoriskey and reported that she was feeling calmer, more relaxed and less depressed with the increase in her Prozac prescription. (R. 466). She said, however, that she still felt depressed at times and continued to have low energy and motivation and intermittently poor sleep. (R. 466). Plaintiff was still non-adherent, as she had run out of medications one week before the appointment. (R. 466). On October 7, 2011, Plaintiff did not show up for a scheduled appointment with Dr. Whoriskey. (R. 467). He noted that Plaintiff would be transferred to Riverside psychiatrist Mercedes Brito, M.D., for "language reasons." (R. 467).

Plaintiff saw Dr. Whoriskey again on October 27, 2011. (R. 468–69). Plaintiff came alone and reported feeling less anxious and more confident traveling alone. (R. 468). She stated, however, that the preceding week she had an episode of anxiety that caused her to go to the emergency room. (R. 468). Dr. Whoriskey remarked that Plaintiff was less depressed and laughing and smiling more, with improved motivation and a good appetite. (R. 468). He discussed Plaintiff's transfer of care to Dr. Brito due to language issues. (R. 468–69).

Progress notes reflect that, on November 29, 2011, Plaintiff saw Dr. Brito, who observed Plaintiff to be alert and oriented, with "ok" mood, full affect and coherent speech. (R. 289). Plaintiff stated that she was taking half of her prescribed dose of Prozac and was taking the other half "when she felt bad." (R. 289). Dr. Brito explained that the medication "does not work like

that." (R. 289).  Dr. Brito noted that Plaintiff was "not amenable to take any more medication." (R. 289).

The administrative record contains progress notes reflecting numerous encounters between Plaintiff and Dr. Brito, including additional appointments on the following dates: December 29, 2012, (R. 290–91); February 2, 2012, (R. 292–93); February 28, 2012, (R. 294); March 28, 2012, (R. 295–96); May 16, 2012, (R. 297–98); June 7, 2012, (R. 299–300); July 11, 2012, (R. 301–302); August 8, 2012, (R. 306–07); September 11, 2012, (R. 313–14); November 6, 2012, (R. 322–23); December 5, 2012, (R. 328 ("No Show")); December 11, 2012, (R. 330–31); January 22, 2013, (R. 337–38, *repeated* 408–09); March 19, 2013, (R. 347–48, *repeated* 416–17).  The appointments largely focused on medication management.

At the appointment on February 2, 2012, Plaintiff reported that she was "very anxious and depressed." (R. 292).  Dr. Brito characterized Plaintiff's mood as depressed, her affect as constricted, her speech as coherent, and both her judgment and her insight as good. (R. 292).  Dr. Brito educated Plaintiff about depression and how it is treated. (R. 292).

On February 28, 2012, Plaintiff reported the same depressive symptoms and requested a therapist. (R. 294).  Dr. Brito noted that, at the end of the appointment, Plaintiff said that she was feeling "ok" and would let Dr. Brito know when to increase her medications. (R. 294).  When asked about hearing voices, Plaintiff responded that her medication, Risperidone, "had helped her tremendously." (R. 294).

On May 16, 2012, Dr. Brito found Plaintiff to have a depressed and anxious mood and constricted affect. (R. 297).  Plaintiff complained of hearing voices. (R. 297).  Despite "good" judgment and cognition, she was still "scare[d] of medications be[ing] increased." (R. 297).

Plaintiff admitted she was illiterate and could not read about her illness. (R. 297). Dr. Brito indicated that a therapist would be assigned to meet with Plaintiff. (R. 301).

On July 14, 2012, Plaintiff met for the first time with licensed medical social worker ("LMSW") David Rosado. (R. 303). Plaintiff reported her mood was depressed, and her affect was observed to be constrained. (R. 303). Plaintiff said that she requested individual therapy because her depressive symptoms were increasing. (R. 303). She also reported that she had begun to hear voices again for the first time in months. (R. 303).

After their first appointment, Plaintiff's therapy sessions with LMSW Rosado were increased from biweekly to weekly. (R. 304). The record contains extensive progress notes reflecting Plaintiff's regular therapy sessions with LMSW Rosado continuing through December 2013. (*See, e.g.*, R. 304–05, 308–12, 315–21, 324–27, 329, 332–36, 339–42, 344–46, 349–51, 353–64, 368–70, 372, 374–76, 406–07, 410–15, 418–28, 431, 433–24, 437–38, 441–45, 447–49).

At her therapy appointment of August 11, 2012, Plaintiff's mood was depressed and her affect mildly blunted. (R. 308). Plaintiff expressed that she was "experiencing flashbacks of the events of 9/11/01." (R. 308). On August 18, 2012, Plaintiff reported that she had a panic attack for which she was taken to the emergency room because her heart was racing. (R. 309). She was "medically cleared and referred to the psych ER," but she checked out against medical advice before she could be transferred. (R. 309). On August 25, 2012, Plaintiff reported to LMSW Rosado that she had had a panic attack the night before and that she "got lost coming to the clinic." (R. 310). LMSW Rosado observed that Plaintiff had "a difficult time concentrating and following instructions." (R. 310).

On August 30, 2012, Plaintiff presented at therapy with depressed mood and congruent affect. (R. 311). LMSW Rosado "provided psychoeducation on [Plaintiff's] possible need for an inpatient hospitalization." (R. 311). On September 15, 2012, Plaintiff reported an increase in feelings of depression and anxiety. (R. 315). LMSW Rosado attempted to use cognitive behavior therapy ("CBT") methods to help her identify her thoughts causing those feelings, but Plaintiff "was unable to focus and concentrate on the task." (R. 315).

On September 22, 2012, Plaintiff reported to LMSW Rosado that "she has been feeling increasingly anxious and has anxiety attacks on a daily basis" and informed him that the "medicine doesn't help me anymore." (R. 316). On October 18, 2012, Plaintiff said that she had been depressed "all week." (R. 319). She had been unable to implement CBT coping strategies because she became overwhelmed and could not focus. (R. 319).

In November 2012, Plaintiff submitted paperwork to attain United States citizenship. (R. 324). She also reported improvement and a decrease in depressive symptoms since her medication had been increased and she began applying the coping mechanisms she had learned in therapy. (R. 321). However, on November 21, 2012, Plaintiff reported "an increase in hearing voices" with the voices telling her "bad and ugly things." (R. 326).

On December 11, 2012, Plaintiff told Dr. Brito that she was "doing better, sleeping better and less depressed." (R. 330). Dr. Brito noted that Plaintiff was "50% improve[d]." (R. 330). On December 13, 2012, Plaintiff reported to LMSW Rosado that she had gone to the emergency room since her last therapy session "due to severe anxiety." (R. 332). Plaintiff's mood was "good" on December 27, 2012, in anticipation of going to see her mother. (R. 334). But on January 3, 2013, she was depressed "because she had been unable to spend the holiday with her mother." (R. 335). On January 9, 2013, Plaintiff entered her therapy session "in the midst of an

anxiety attack." (R. 336). LMSW Rosado helped Plaintiff work through the attack. (R. 336). On January 22, 2013, Plaintiff told Dr. Brito she was "doing ok, and sleeping better." (R. 337). Dr. Brito observed that Plaintiff's mood was improved and that Plaintiff was less anxious. (R. 337).

On April 17, 2013, Plaintiff saw neurologist Teresella Gondolo, M.D., for her seizures. (R. 490–502). On mental status examination, Dr. Gondolo observed that Plaintiff was alert and well oriented, with normal comprehension and judgment and appropriate affect and behavior. (R. 493). Dr. Gondolo ordered an electroencephalogram ("EEG") and magnetic resonance imaging ("MRI") of Plaintiff's brain. (R. 496–97). The MRI results showed Plaintiff's brain was normal; however, occasional amplitudes and sharp and low wave discharges on the EEG indicated that Plaintiff was at risk for seizures. (R. 496–98). After a follow-up consultation on May 6, 2013, Dr. Gondolo remarked that Plaintiff was neurologically stable. (R. 498).

On June 24, 2013, Plaintiff saw psychiatrist Diane D'Allegro, M.D., at Riverdale. (R. 429–30, *repeated* 534–35). Plaintiff complained of anxiety and "a feeling of dread." (R. 429). On mental status examination, Dr. D'Allegro observed that Plaintiff was neatly dressed, cooperative and pleasant. (R. 429). She made eye contact and related appropriately. (R. 429). Her speech was normal, her mood was "a little anxious," and her affect was full and appropriate. (R. 429). Dr. D'Allego characterized Plaintiff's judgment as fair and her insight as limited. (R. 429).

## 2. Medical Evidence Generated During the Relevant Period

The administrative record also includes evidence generated by Plaintiff's treatment providers during the relevant period—that is, between August 5, 2013 and July 30, 2015.

On August 7, 2013, Plaintiff saw Dr. Gondolo with complaints of light-headedness, dizziness, and syncopal (fainting) feelings. (R. 503). On physical examination, Dr. Gondolo

observed that Plaintiff's head, nose, eyes and extremities were normal. (R. 504). Plaintiff's neck had full range of motion despite stiffness and tenderness to touch. (R. 505). Diminished range of cervical and lumbar motion was noted, although straight leg raising was negative. (R. 506). Her extremities had full strength throughout, and her coordination and gait were normal. (R. 506). On mental examination, Plaintiff was alert and fully oriented. (R. 505). Her comprehension, judgment and ability to repeat and name objects was normal; immediate, recent, and remote memories were intact; and her affect and behavior were appropriate. (R. 505). The rest of the mental status examination findings were similarly unremarkable. (R. 505–06). Dr. Gondolo assessed seizure disorder. (R. 506).

Progress notes reflect the continuation of Plaintiff's appointments with Dr. D'Allegro and LMSW Rosado into the relevant period. On August 20, 2013, Plaintiff saw Dr. D'Allegro with complaints of daily anxiety attacks, although she still felt "good." (R. 536–37, *repeated* 432, 446). Plaintiff denied hearing voices when she was compliant with her medication. (R. 536). On examination, Plaintiff was smiling and cooperative. (R. 536). Her affect was full and appropriate; her thought process was goal-directed; and she was fully oriented to person, place and time. (R. 536–37). Her memory was intact; her attention and concentration were fair; and her insight and judgment were limited. (R. 537). Dr. D'Allegro assessed panic disorder and major depression with psychotic features in partial remission. (R. 537). She increased Plaintiff's dose of Prozac to thirty milligrams and recommended counseling. (R. 537).

Four days later, Plaintiff attended a therapy session with LMSW Rosado. (R. 433). Plaintiff discussed an upcoming brain functioning study and the anxiety she felt because of it. (R. 433). Dr. D'Allegro reported that, by the end of the session, Plaintiff was able to control her anxiety about the study. (R. 433). During therapy sessions in September 2013, Plaintiff

discussed challenges she faced due to forgetfulness and miscommunication after missing prior appointments, and she was able to control her anxiety during the sessions. (R. 434, 437).

When Plaintiff saw Dr. D'Allegro in September 2013, she reported that she had not had any anxiety attacks, felt less depressed and was sleeping well. (R. 435–36, *repeated* 538–39). On examination, Plaintiff appeared neatly dressed and groomed. (R. 435). She was pleasant, cooperative and made appropriate eye contact. (R. 435). Her speech was normal, her mood and affect were normal and "better," her thought process was goal-directed, and she did not have any delusions. (R. 435). Dr. D'Allegro noted that Plaintiff was responding well to the increased dosage of Prozac. (R. 436).

At an October 12, 2013 visit, Plaintiff reported to LMSW Rosado that she felt better since her medication was increased, which was helping her manage her anxiety. (R. 438). LMSW Rosado noted that Plaintiff was calmer than she had been in recent sessions. (R. 438). She reported fewer irrational thoughts, but was still concerned with her living and financial situation. (R. 438). A few days later, on October 15, Plaintiff followed up with Dr. D'Allegro, reporting that she had only mild anxiety and depression and felt like she could handle her symptoms. (R. 439–40, *repeated* 540–41). She denied experiencing auditory hallucinations since starting Risperdal and was sleeping well. (R. 439). Mental status examination findings remained the same from the previous visit, except that Plaintiff's mood was now euthymic, her affect was normal, and her insight and judgment were fair. (R. 439–40). Dr. D'Allegro recommended Plaintiff continue on her medication regimen.

Following an October 30, 2013 follow-up visit, Dr. Gondolo again found that Plaintiff was neurologically stable. (R. 508–12, *repeated* 607–08). Physical and mental examination results were the same as her previous visit. (R. 509–11).

10

On November 1, 2013, LMSW Rosado completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental). (R. 395–97). LMSW Rosado indicated that Plaintiff had marked limitations in her ability to understand, remember and carry out instructions and interact with the public; moderate limitations in her ability to interact with co-workers and respond to changes in the work setting; and mild limitations in her ability to interact with supervisors. (R. 395–96). LMSW Rosado further noted that Plaintiff's ability to travel via public transportation was limited due to panic attacks, but she could travel by car. (R. 396).

On November 11, 2013, Plaintiff's primary care physician, Patricia Gonzalez, M.D., completed a report on Plaintiff's physical capacities. (R. 388–93, *repeated* 583–88). Dr. Gonzalez failed to submit treatment notes in support of her assessment despite the ALJ's requests. (*See* R. 58). On May 30, 2014, Dr. Gonzalez completed another Medical Source Statement of Ability to Do Work-Related Activities (Physical) that was essentially identical to her November 11, 2013 Statement. (*Compare* R. 560–65, *with* R. 388–93).

During therapy sessions with LMSW Rosado in November 2013, Plaintiff expressed increased anxiety without any specific triggers. (R. 441, 447–49). LMSW Rosado instructed Plaintiff on using relaxation techniques to regulate her anxiety, and she left the sessions with improved mood. (R. 441, 447–48). On December 3, 2013, Plaintiff complained to Dr. D'Allegro of increased anxiety, although she was still able to take the bus to the appointment. (R. 450–52, *repeated* 543–44). On examination, Dr. D'Allegro observed that Plaintiff was cooperative, pleasant and not agitated. (R. 450). Her speech was normal, and she displayed nervous mood and full affect. (R. 450). Dr. D'Allegro recommended that Plaintiff continue her medication regimen. (R. 451). At a therapy session later that month, Plaintiff expressed feeling anxious, and

LMSW Rosado reinforced relaxation techniques, advising Plaintiff to practice them independently at home. (R. 406).

The record contains a Psychiatric/Psychological Impairment Report dated January 13, 2014 by LMSW Rosado and Dr. D'Allegro. (R. 399–402, *repeated* 453–57). The report states that Plaintiff was diagnosed with major depression with psychotic features and panic disorder. The report identifies the following signs and symptoms experienced by Plaintiff: difficulty thinking or concentrating; generalized persistent anxiety; decreased energy; feelings of guilt or worthlessness; recurrent and intrusive recollections of a traumatic experience, which are the source of marked distress; paranoid thinking or inappropriate suspiciousness; vigilance and scanning; sleep disturbance; and recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average or at least one a week. (R. 400). According to the report, Plaintiff had marked limitations in maintaining social functioning and in maintaining concentration, persistence and pace. (R. 401). Further, Plaintiff had an affective disorder of more than two-years duration, causing more than a minimal limitation to do any basic work activity with "symptoms or signs currently attenuated by medication or psychosocial support," and residual disease with such minimal adjustment that "even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate." (R. 401). Attendant problems were "chest palpitations" and frequent emergency room visits. (R. 402).

On February 5, 2014, Plaintiff returned to Dr. Gondolo with complaints of generalized anxiety and tinnitus. (R. 513–17, *repeated* 613–17). Physical and mental examinations remained the same as at the previous visit, and Dr. Gondolo asked Plaintiff to follow up in four to six

weeks. (R. 514–17).  That same day, Dr. Gondolo drafted a letter opining that Plaintiff was "totally and permanently disable[d]." (R. 403).

On February 19, 2014, Plaintiff visited Dr. D'Allegro for medication management, as Plaintiff was flying to the Dominican Republic to visit her aunt and wanted to make sure that she had enough medication. (R. 547–48).  Plaintiff reported feeling good with occasional anxiety and no panic attacks. (R. 547).

Dr. D'Allegro filled out a Psychiatric Medical Report on April 28, 2014. (R. 566–69).  In terms of mental status examination findings, she noted Plaintiff was cooperative and pleasant, her speech was normal, and she was not currently experiencing hallucinations or delusions. (R. 566).  Plaintiff's mood was anxious with an affect congruent to mood, her attention and concentration were within normal limits, and she had intact memory, an average fund of information, fair judgment and limited insight. (R. 567).  Dr. D'Allegro opined that Plaintiff's activities of daily living were not affected, but she needed an escort to use public transportation. (R. 568).  In social functioning, Plaintiff tended to isolate herself and had no friends or support system, except for one of her children and a cousin. (R. 568).  She noted that Plaintiff becomes anxious in new settings, around new people and could not follow procedures unless directly supervised. (R. 568).  On May 12, 2014, Plaintiff saw Dr. D'Allegro again, complaining of significant anxiety the day before; however, she felt calm at the appointment because she had slept well the night before. (R. 549).  Dr. D'Allegro increased Plaintiff's Prozac dosage. (R. 550).

On June 4, 2014, Dr. Gondolo completed a Neuro/Seizure Questionnaire Form. (R. 580–82).  Dr. Gondolo noted that Plaintiff had seizures, depression and vertigo, as well as normal clinical findings in terms of cranial nerves, deep tendon reflexes and motor strength and tone,

and full strength in her upper extremities. (R. 581). In a Medical Source Statement of Ability to Do Work-Related Activities (Physical) dated June 6, 2014, Dr. Gondolo opined that Plaintiff could lift and carry ten pounds occasionally, and could only sit, stand and walk for one hour consecutively each in an eight-hour workday. (R. 574). Plaintiff could only walk one block. (R. 574). She could frequently reach in all directions and use foot controls, but could not push or pull. (R. 575). Plaintiff could occasionally climb stairs and ramps, but never climb ladders or scaffolds, balance, stoop, kneel, crouch, or crawl, due to vertigo. (R. 576). She could never be exposed to environmental limitations such as unprotected heights, moving mechanical parts, operating a motor vehicle, humidity and wetness, dust, odors, fumes and pulmonary irritants, extreme cold/heat, or vibrations, due to severe vertigo, headaches and seizures. (R. 577). Dr. Gondolo noted that Plaintiff could shop, ambulate without a wheelchair, walk a block at a reasonable pace and on uneven surfaces, prepare a simple meal to feed herself, and care for personal hygiene. (R. 578).

At a June 16, 2014 re-examination, Dr. Gondolo's observations were generally consistent with prior examinations, and Dr. Gondolo diagnosed vertigo, generalized anxiety and seizures. (R. 521). That same day, Plaintiff complained to Dr. D'Allegro of nervousness, shortness of breath, chest tightness and lightheadedness. (R. 551). Plaintiff reported that she was feeling good up until the day of the appointment, and that she may have forgotten to take her medication in the morning. (R. 551). On examination, Plaintiff was cooperative and did not appear agitated. (R. 551). Her speech was normal and her mood was "good." (R. 551). D'Allegro recommended Plaintiff take her medication as prescribed. (R. 552).

On August 19, 2014, Plaintiff saw Dr. D'Allegro again for medication management. (R. 554–55). She indicated she felt anxious because she took the bus to the appointment.

(R. 554). On examination, Plaintiff's mood was "bad/nervous" and her affect was congruent. (R. 554). Dr. D'Allegro adjusted Plaintiff's medication. (R. 554). On September 17, when Plaintiff returned to Dr. D'Allegro, she reported being compliant with medication and feeling better. (R. 556). Examination findings remained the same from the previous visit, except Plaintiff's mood was "better" and she had normal affect. (R. 556). Dr. D'Allegro noted that Plaintiff's symptoms were currently controlled. (R. 557). The following month, on October 14, 2014, Plaintiff returned to Dr. D'Allegro with complaints of restlessness, although she was compliant with medication and felt calmer. (R. 558). Medical examination findings remained unchanged from the previous two visits, except that her mood was normal. (R. 558). Dr. D'Allegro noted Plaintiff was stable on her current medication and that her anxiety was controlled. (R. 558–59).

On February 25, 2015, Dr. D'Allegro completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental). (R. 570–72). Dr. D'Allegro opined that Plaintiff had marked limitations in her ability to understand, remember and carry out simple instructions, understand and remember complex instructions, and make simple work-related decisions. (R. 570). Plaintiff had extreme limitations in her ability to make work-related decisions and carry out complex instructions. (R. 570). Plaintiff had marked limitations in her ability to interact with the public, coworkers and supervisors, and in her ability to respond appropriately to changes in the work setting. (R. 571).

### 3. Medical Evidence Generated After the Relevant Period

After ALJ Shire issued her decision, Plaintiff's attorney submitted additional evidence to the Appeals Council. (R. 5). In particular, Plaintiff's attorney submitted a mental disorder evaluation form completed by Dr. D'Allegro on October 12, 2015. (R. 630–32). Summarizing

her findings, Dr. D'Allegro wrote that Plaintiff's "mental impairment is marked by lack of concentration, daily anxiety/panic attacks, paranoia, hallucinations, agoraphobia, irrational fears of objects or activities or situations. All these symptoms prevent [her] from performing any work-related activity." (R. 632).

**B.  Consultative Evaluations**

As summarized below, the administrative record contains consultative evaluations by an examining physician and an examining psychologist.

**1.  Consultative Examiner Marilee Mescon, M.D.**

Dr. Marilee Mescon, a physician, performed a consultative internal medicine examination of Plaintiff on September 16, 2013. (R. 381–84).  Dr. Mescon remarked that Plaintiff was "a very poor historian." (R. 381).  Plaintiff's chief complaint was seizures, which she reported first having five years earlier. (R. 381).  Plaintiff stated that she could not remember how many seizures she had experienced in the preceding two months and could not remember when her last seizure occurred. (R. 381).  Plaintiff explained that she could shower, bathe and dress herself, and that she spent her time watching television, listening to the radio and socializing with friends. (R. 381–82).

Dr. Mescon's findings on examination were mostly unremarkable. (R. 382).  Plaintiff had normal gait and stance and could walk on heels and toes without difficulty. (R. 382).  Plaintiff had full strength in her upper and lower extremities. (R. 383).  Dr. Mescon noted that Plaintiff was wearing a hearing aid and reported difficulty hearing normal voice tones. (R. 382).

Dr. Mescon diagnosed seizure disorder and hearing disorder. (R. 383).  Dr. Mescon opined that Plaintiff had no limitations in her ability to sit or to stand, but her capacity to climb, push, pull or carry heavy objects was severely limited because of the possibility of Plaintiff

having a seizure. (R. 383).  Dr. Mescon advised that, due to her seizures, Plaintiff should never

operate heavy machinery, drive motor vehicles or be in environments where she is exposed to

heights. (R. 383–84).

## 2.  Consultative Examiner David Mahony, Ph.D.

Also on September 16, 2013, Dr. David Mahony, a psychologist, performed a

consultative psychiatric evaluation of Plaintiff. (R. 377–80).  Dr. Mahony described Plaintiff as

"cooperative and evasive" and noted that she did not answer most of the questions asked of her.

(R. 378).  Plaintiff said that she could not remember many things, including the length of time

and distance she traveled to reach the appointment, how old her daughter was, how long she had

been in the United States, how far she went in school, when she last worked and why she stopped

working. (R. 377).  She was also unable to explain her significant memory problems. (R. 378).

Plaintiff reported symptoms of depression, including depressed mood, hopelessness, loss

of interests and social withdrawal. (R. 377–78).  She also explained that she had "panic attacks,"

though she was unable to clarify any symptoms of panic disorder other than anxious mood.

(R. 378).  She also reported cognitive deficits of an unknown origin, short-term memory deficits

and difficulty learning new material. (R. 378).

On examination, Plaintiff's posture and motor behavior were normal; her eye contact was

appropriate; her speech was fluent and clear; her thought processes were coherent and goal-

directed; her affect was dysphoric; her mood was dysthymic; and her sensorium was clear.

(R. 378).  Dr. Mahony noted that Plaintiff's attention and concentration were impaired, as

Plaintiff reported that she did not know how to count to five or perform simple calculations.

(R. 379).  Dr. Mahony also indicated that Plaintiff's memory skills were impaired, as Plaintiff

reported that she could not recall any objects immediately or after five minutes and could not

state any digits forwards or backwards. (R. 379).  Dr. Mahony described Plaintiff's cognitive functioning as below average and her insight and judgment as poor. (R. 379).  Dr. Mahony noted that Plaintiff reported hearing problems, but she did not use hearing aids and had never been evaluated for her hearing problems.  Plaintiff reported that she could dress, bathe and groom herself, and that she socialized with friends and spent her time at home. (R. 379).

In his report, Dr. Mahony stated that there was no evidence of limitation in Plaintiff's ability to follow and understand simple directions and instructions or to perform simple tasks independently. (R. 379).  Dr. Mahony wrote that, due to her cognitive and psychiatric deficits, Plaintiff had mild difficulty maintaining attention and concentrating, maintaining a regular schedule, learning new tasks, performing complex tasks, making appropriate decisions, relating to others and dealing with stress. (R. 379).  He opined that the results of the evaluation were consistent with cognitive and psychiatric deficits, but those deficits did not seem to interfere with Plaintiff's ability to function on a daily basis. (R. 379).  Dr. Mahony diagnosed "[d]epressive disorder mild" and "[c]ognitive disorder NOS" (not otherwise specified) and seizures. (R. 380). He rated Plaintiff's prognosis as poor, as she had "no motivation to become employed." (R. 380).

## C.  Plaintiff's Testimony

Plaintiff appeared in person at the hearing on April 21, 2015, before ALJ Shire. (R. 65). She was represented by her attorney, William Henderson. (R. 65).  A Spanish-language interpreter was also present. (R. 65).

Plaintiff testified that she was born in the Dominican Republic and estimated that she had been in the United States for approximately seventeen or eighteen years (R. 67).  She testified that she reached the second grade of primary school, and that she could read a little bit in Spanish but could not write. (R. 77–78)

She raised three children. (R. 67).  She testified that she worked as a babysitter between 1998 and 2000. (R. 68–69).  She stopped babysitting because of the medications she was taking, including Clonazepam and an antidepressant. (R. 70–71).  She also said that she worked as a dishwasher at a restaurant for three or four years, but she could not recall when she did so. (R. 68, 71).  She stated that she took and passed a United States citizenship test the year before the hearing. (R. 72).  She further testified that she went back to visit the Dominican Republic about one-and-a-half years before the hearing, when her grandmother died. (R. 76).

Plaintiff testified that she had suffered from seizures for about fifteen years, but that her medication "[m]ore or less" controlled her seizures. (R. 73).  She also stated that she does not hear voices when she takes her medications. (R. 75).  Plaintiff said that she "always [lives] in fear" after being traumatized during the attack on the World Trade Center on September 11, 2001. (R. 75–76).  She testified that she has panic attacks "daily." (R. 93).  She acknowledged that her medication controlled her panic attacks "a little bit." (R. 76).

Plaintiff testified that she was "very sick" and "always sitting on the couch." (R. 79).  She said she had "a lot of memory problems" due her medications. (R. 77).  When asked by her attorney to explain why she could not work, she testified that she had trouble sleeping, ringing in her ears, problems with her head, nausea, stress and pain in her knees. (R. 80).

**D.  Medical Expert Testimony**

Dr. Sree Devi Chandrasekhar, a medical expert, was also present at the hearing on April 21, 2015, for the purpose of helping the ALJ understand Plaintiff's medical records. (R. 65–66, 81–92).  Dr. Chandrasekhar is a medical doctor with decades of professional experience. (R. 184).  After asking Plaintiff some clarifying questions, Dr. Chandrasekhar testified that, in his estimation, Plaintiff's condition did not meet or equal any of the listings. (R. 86).  Dr.

Chandrasekhar also remarked that many of Plaintiff's treatment notes were contradictory, and that "it looks like when she is adhering to the medications, she's better." (R. 84–85, 92).

## E.  Vocational Expert Testimony

At the hearing on April 21, 2015, Vocational Expert ("VE") Helene Feldman testified by telephone. (R. 93–99).  The ALJ asked VE Feldman to assume an individual of Plaintiff's vocational background who could not tolerate fast-paced work, balance, drive or be exposed to heights or dangerous machinery; could occasionally tolerate changes in the workplace; and could only perform simple and repetitive tasks. (R. 95–97).  The VE testified that such an individual could perform unskilled light work of housekeeper with 917,470 jobs in the national economy; marker with 1,800,410 jobs in the national economy; and sandwich-board carrier with 76,870 jobs in the national economy. (R. 97).

## F.  ALJ Shire's Decision

In her decision dated July 30, 2015, (R. 30–43), ALJ Shire followed the five-step procedure established by the Commissioner for evaluating disability claims. *See* 20 C.F.R. § 416.920.  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since she applied for SSI. (R. 32).  At step two, the ALJ found that Plaintiff had the following severe impairments: depression, an anxiety disorder, spasm in the lumbar spine and a seizure disorder. (R. 32).  The ALJ found that Plaintiff's vertigo and headaches were non-severe impairments. (R. 32).

At step three, the ALJ found that Plaintiff did not have an impairment or a combination of impairments that met or medically equaled the severity of one the of the impairments set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1. (R. 33).  The ALJ accorded significant weight to the medical expert's testimony that none of Plaintiff's conditions met or equaled a listing.

(R. 33). The ALJ found that Plaintiff's lumbar spasm did not meet a listing due to the absence of diagnostic tests of Plaintiff's lumbar spine. (R. 33). The ALJ found that Plaintiff's seizure disorder did not meet the listings because, among other reasons, the record indicated that Plaintiff's seizures were controlled on medication. (R. 33). The ALJ specifically considered whether Plaintiff's mental impairment met or medically equaled the criteria of Listing 12.04 or 12.06. (R. 33). The ALJ gave little weight to the opinions of Dr. D'Allegro and LMSW Rosado because the ALJ found that they were inconsistent with the contemporaneous treatment records. (R. 33). Relying primarily on the report of Dr. Mahony, the ALJ found that Plaintiff had only mild restriction in activities of daily living and only mild difficulties with social functioning. (R. 33). The ALJ found that Plaintiff had moderate difficulties regarding concentration, persistence or pace. (R. 33–34). The ALJ further found that Plaintiff had experienced no episodes of decompensation. (R. 34).

The ALJ then found that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. 416.967(b), except that Plaintiff could not communicate in English, could not work near heights or dangerous machinery, could not drive, could not work in a job that requires balancing or fast pace like factory assembly-line work, and could only perform simple and repetitive tasks. (R. 34). In making the RFC determination, the ALJ found that Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were "not entirely credible." (R. 34).

At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (R. 41). The ALJ therefore proceeded to the fifth and final step of the sequential evaluation process. (R. 42). At step five, the ALJ relied on the VE's testimony to find that Plaintiff could

perform work that exists in significant numbers in the national economy and that she was therefore not disabled. (R. 42).

## II. DISCUSSION

In her memorandum of law, Plaintiff challenges the ALJ's decision on two grounds. (Docket No. 23 at 22–28). Plaintiff's primary argument is that the ALJ's decision is not supported by substantial evidence because the ALJ omitted and mischaracterized relevant evidence. (*Id.*). Plaintiff also argues, in a single paragraph, that the ALJ failed to adequately develop the record. (*Id.* at 27–28). Conversely, the Commissioner argues that the ALJ's decision should be affirmed because it is supported by substantial evidence and based upon correct legal standards. (Docket Nos. 25, 26). After summarizing the applicable legal standards, the Court addresses Plaintiff's arguments below.

## A. Legal Standards

A claimant is disabled if she "is unable 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (quoting 42 U.S.C. § 423(d)(1)(A)). The SSA has enacted a five-step sequential analysis to determine if a claimant is eligible for benefits based on a disability:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117,

120 (2d Cir. 2008); 20 C.F.R. § 416.920(a)(4)(i)-(v)).

The claimant has the general burden of proving that he or she is statutorily disabled "and

bears the burden of proving his or her case at steps one through four." *Cichocki*, 729 F.3d at 176

(quoting *Burgess*, 537 F.3d at 128). At step five, the burden then shifts "to the Commissioner to

show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*,

683 F.3d 443, 445 (2d Cir. 2012).

**B. Standard of Review**

When reviewing an appeal from a denial of SSI benefits, the Court's review is "limited to

determining whether the SSA's conclusions were supported by substantial evidence in the record

and were based on a correct legal standard." *Selian v. Astrue,* 708 F.3d 409, 417 (2d Cir. 2013)

(quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also* 42 U.S.C. § 405(g).

The Court does not substitute its judgment for the agency's, "or determine *de novo* whether [the

claimant] is disabled." *Cage v. Comm'r of Soc. Sec.,* 692 F.3d 118, 122 (2d Cir. 2012) (alteration

in original) (quoting *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998)). However, where the

proper legal standards have not been applied and "might have affected the disposition of the

case, [the] court cannot fulfill its statutory and constitutional duty to review the decision of the

administrative agency by simply deferring to the factual findings of the ALJ." *Pollard v. Halter*,

377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir.

1984)). Therefore, "[f]ailure to apply the correct legal standards is grounds for reversal." *Id.*

"Where there are gaps in the administrative record or the ALJ has applied an improper legal

standard," remand to the Commissioner "for further development of the evidence" is appropriate.

*Rosa v. Callahan,* 168 F.3d 72, 82–83 (2d Cir. 1999) (quoting *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996)).

## C. Duty to Develop the Record

"Social Security proceedings are inquisitorial rather than adversarial." *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000). Consequently, an ALJ, unlike a judge in a trial, has an affirmative duty to develop the record on behalf of all claimants. *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009). The ALJ must "investigate the facts and develop the arguments both for and against granting benefits." *Sims*, 530 U.S. at 111. The applicable SSA regulations provide, in relevant part, "we will develop your complete medical history for at least the 12 months preceding the month in which you file your application unless there is a reason to believe that development of an earlier period is necessary or unless you say that your disability began less than 12 months before you filed your application." 20 C.F.R. § 416.912(d) (version effective Apr. 20, 2015 to Mar. 26, 2017); *see also* 42 U.S.C. §§ 423(d)(5)(B), 1382c(a)(3)(H)(i).

Plaintiff argues that the ALJ failed to develop the record because she did not obtain emergency room records. "However, the duty to develop the record is 'not absolute,' and requires 'the ALJ only to ensure that the record contains sufficient evidence to make a determination.'" *Johnson v. Comm'r of Soc. Sec.*, No. 17-CV-5598 (BCM), 2018 WL 3650162, at *13 (S.D.N.Y. July 31, 2018) (quoting *Bussi v. Barnhart*, No. 01 Civ. 4330(GEL), 2003 WL 21283448, at *8 (S.D.N.Y. June 3, 2003)). A court may uphold an ALJ's determination where the record is "adequate to permit an informed finding." *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013). Here, the ALJ requested medical records from all of the providers Plaintiff listed in her SSI application paperwork. (R. 47–50, 58–62, 221–22, 238–40). The ALJ obtained extensive treatment records and additionally ordered consultative examinations and solicited the input of a medical expert. Plaintiff was also represented by legal counsel before the

ALJ, and that counsel submitted additional medical evidence to both the ALJ and the Appeals Council. (R. 5, 66, 406–527, 630–32).

In her decision, the ALJ noted that the specific statement that Plaintiff "had been visiting the emergency room four to six times monthly" was not documented in the record. (R. 37). The ALJ also observed that Plaintiff did not report any emergency room visits in her Disability Report, and that Plaintiff's counsel did not mention any in his brief. (R. 39). As a result, the ALJ considered Dr. D'Allegro's statement about emergency room visits to be unremarkable, but the ALJ did not rely on the absence of documentation as the foundation for her disability determination. (R. 39). The record contained sufficient evidence to permit the ALJ to make an "informed finding." As such, the ALJ's failure to obtain emergency room records did not constitute a breach of her duty to develop the record and does not warrant remand.

Plaintiff also objects that the ALJ did not seek further treatment notes from Dr. D'Allegro and LMSW Rosado, "although both parties continued to treat the patient." (Docket No. 23 at 27). Pursuant to the SSA regulations, "[t]he duty to develop medical records normally extends only to obtaining medical history for at least the twelve months *preceding* the month of application." *Moreira v. Colvin*, No. 13 Civ. 4850(JGK), 2014 WL 4634296, at *5 n.2 (S.D.N.Y. Sept. 15, 2014) (citing 20 C.F.R. § 416.912(d) (version effective Apr. 20, 2015 to Mar. 26, 2017)). "Whether the ALJ has a duty to develop the record with respect to treating sources *after* the date of filing is not settled and may depend on the facts of the case." *Moreira*, 2014 WL 4634296, at *5 n.2. Some courts have held that the duty to develop the record does not require the ALJ to obtain medical records generated *after* the filing date of the claimant's application. *See, e.g.*, *Brown v. Comm'r of Soc. Sec.*, 709 F. Supp. 2d 248, 257 (S.D.N.Y. 2010); *Infante v. Apfel*, No. 97 CIV. 7689 LMM, 2001 WL 536930, at *7 (S.D.N.Y. May 21, 2001); *Centano v. Apfel*, 73 F.

Supp. 2d 333, 337 (S.D.N.Y. 1999). In contrast, other courts have held that the ALJ is responsible for developing a complete record during the time that elapses between the claimant's application and the claimant's hearing date. *See, e.g.*, *Corporan v. Comm'r of Soc. Sec.*, No. 12-Civ-6704 (JPO), 2015 WL 321832, at \*27 (S.D.N.Y. Jan. 23, 2015); *Moreira*, 2014 WL 4634296, at \*5 n.2.

Here, the record includes extensive treatment notes from Plaintiff's treating psychiatrists and therapist from both before and during the relevant period—including treatment notes for Dr. D'Allegro through October 2014 and for LMSW Rosado through December 2013. (R. 406, 558). The record also includes a report from Dr. D'Allegro from October 2015—several months after the ALJ issued her decision. (R. 632). Plaintiff's counsel has not identified any evidence that suggests that more recent treatment notes from Dr. D'Allegro or LMSW Rosado would materially alter the ALJ's analysis. Accordingly, the Court finds that the ALJ satisfied her duty to develop the record.

## D. Substantial Evidence

Plaintiff's primary argument is that the ALJ's decision is not supported by substantial evidence in the record. (Docket No. 23 at 22–28). Plaintiff argues that the Court should reverse the ALJ's decision because, in Plaintiff's view, the treatment notes in the record paint a "very different picture" of Plaintiff's psychiatric condition than that described by the ALJ. (*Id.* at 24). However, the Second Circuit has characterized the substantial evidence standard as "a very deferential standard of review—even more so than the 'clearly erroneous' standard." *Brault*, 683 F.3d at 448 (citing *Dickinson v. Zurko*, 527 U.S. 150, 153 (1999)). Once an ALJ finds facts, a court "can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Id.* (internal quotation marks omitted). Thus, the findings of fact in a disability determination

must be upheld if they are supported by substantial evidence, even if there is also substantial evidence for the claimant's position. *See DeChirico v. Callahan*, 134 F.3d 1177, 1182 (2d Cir. 1998) (affirming Commissioner's denial of disability benefits where there was substantial evidence for both sides); *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) ("'[T]he court may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review.'" (quoting *Valente v. Sec'y of Health and Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984))); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve.").

After a thorough review of the record, the ALJ reasonably determined that Plaintiff's mental impairments did not result in limitations exceeding those of the ALJ's RFC determination. In making that determination, the ALJ discussed in detail the evidence in the record, including the medical records from Plaintiff's treatment at Riverdale. (R. 35–41). From a general standpoint, the ALJ viewed Plaintiff's condition longitudinally, and found that when she was compliant with medication, her symptomatology improved. (R. 37–38, 536, 554, 556, 558). Indeed, before and immediately after her alleged onset date, Plaintiff's symptomatology seemed to worsen when she did not allow her doctors to adjust her medication. (*See, e.g.*, R. 290 ("She is not amenable to take any more medication"), 292, 294–95, 297 ("Discussed with [patient] how she does not allow me to make any changes in the medications"), 299, 301, 306, 322, 330, 337, 347; *but see* R. 321 ("Patient reports a decrease in her depressive symptoms since her medication increase"), 435, 537). The medical expert, Dr. Chandrasekhar, also determined that when Plaintiff adhered to her medication, she was better. (R. 84–85).

In determining a claimant's RFC, an ALJ must apply the so-called "treating source rule," also known as the "treating physician rule," which requires the ALJ to accord controlling weight to the medical opinions of "treating sources" when those opinions are "well-supported by

medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 416.927(c)(2). If, however, there is substantial evidence in the record that contradicts or questions the credibility of a treating source's assessment, the ALJ may give that treating source's opinion less deference. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (finding that treating physician's opinions were not entitled to controlling weight because they were not supported by substantial evidence in the record).

The treating source rule does not apply to the opinions of LMSW Rosado because licensed medical social workers are not considered "acceptable medical sources" for purposes of the rule. *See Marcano v. Berryhill*, No. 16cv08033 (DF), 2018 WL 2316340, at *6 n.19 (S.D.N.Y. Apr. 30, 2018) (citing 20 C.F.R. § 416.913(a); SSR 06-03p, 2006 WL 2329939, at *2); 20 C.F.R. § 416.927(a)(2).

Regarding Dr. D'Allegro, the ALJ reasonably concluded that the doctor's concurrent mental status examination findings did not corroborate the doctor's assessment that Plaintiff had extreme or marked limitations. (R. 39). For example, Dr. D'Allegro regularly found that Plaintiff was cooperative and fully oriented, with intact attention, concentration and memory, goal-directed thought process and no delusions or hallucinations. (R. 435–36, 439–40, 450, 520, 537, 547–52, 554–55, 558–59). Additionally, Plaintiff frequently reported only mild anxiety or depression and stated that her medication was working and that she was feeling "good" or "better." (R. 435, 439–40, 450–51, 536, 547, 549–50). Moreover, Dr. D'Allegro's assessment of Plaintiff's limitations is inconsistent with the assessment of consultative psychologist Dr. Mahony, who identified only mild deficits, which did not interfere with Plaintiff's ability to function on a daily basis. (R. 379). *See Snyder v. Colvin*, 667 F. App'x 319, 320 (2d Cir. 2016)

("The opinion of a treating physician is not binding if it is contradicted by substantial evidence, and a consulting physician report may constitute such evidence."). The ALJ also noted that the treatment records from Dr. Gondolo, Plaintiff's treating neurologist, documented normal mental status examinations. (R. 38).

In addition to considering the medical evidence, the ALJ reasonably determined that the totality of the evidence did not corroborate Plaintiff's subjective symptomatology to the disabling extent she alleged. (R. 39–40). The ALJ noted that, during the consultative examination with Dr. Mahony, Plaintiff alleged she could not remember almost any information—including her own daughter's age—despite her memory being found intact during numerous other examinations. (R. 39, 377, 436, 505, 537, 550). Additionally, she testified that she had panic attacks daily, but reported to her doctors that her panic attacks were improving and she was only having occasional anxiety with no panic attacks. (R. 93, 547). Cognitively, Plaintiff seemed capable of functioning at a higher level that she alleged. (R. 39). The ALJ noted that Plaintiff enrolled in English-language classes and managed to study for and pass her citizenship examination, even if she was allowed to take the test in her native language. (R. 35, 38, 39, 72, 322, 367–68). She told her doctors that she was isolated socially, but also reported that she goes to church every Sunday and socializes with friends. (R. 230, 379). The ALJ properly discounted Plaintiff's credibility based on these discrepancies. Accordingly, substantial evidence supported the ALJ's disability determination.

## III. CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is denied, the Commissioner's cross-motion for judgment on the pleadings is granted, and the case is dismissed. The Clerk is respectfully requested to terminate the pending motions (Docket Nos. 22, 24) and close the case.

Dated:   August 24, 2018
       White Plains, New York

**SO ORDERED:**

_____
JUDITH C. McCARTHY
United States Magistrate Judge